Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

June 17, 2026

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Because Mr. Palma satisfies the requirements of 18 U.S.C. § 3583(e) and, based upon the exhibits to his counsel's letter of June 17, 2026 (ECF 52), it is in the interests of justice to terminate his supervised release early, the Court grants the application and terminates supervised release effective October 23, 2026.
SO ORDERED
[signature]
USDJ
10·13·26

Re: ***United States v. David Palma,* 20-CR-71 (PKC)**

Dear Judge Castel,

Without objection from Probation, David Palma requests that the Court grant his motion for early termination of supervised release.[1] *See* Email from Probation, attached as Exhibit A. Mr. Palma has served twenty months of his three-year term of supervised release. Since being released on October 21, 2024, Mr. Palma has not committed a violation nor given his supervising officer any reason for concern. Rather, he has worked tirelessly seven days a week at a delicatessen in East Harlem to support his sick wife and teenage daughters. His supervising officer quickly took note of his consistent compliance and dedication to lawful employment and, after the first six months Mr. Palma was transferred to the Southern District's Low Intensity Unit — a designation reflecting his probation officer's professional judgment that active probationary oversight is no longer necessary or appropriate.

We write to request early termination of Mr. Palma's supervised release pursuant to 18 U.S.C. § 3583(e)(1). Mr. Palma is stably housed, steadily employed, and deeply motivated by a singular goal: reuniting with his ill wife and building the best possible life for his two young daughters. Those daughters remain in the Dominican Republic, separated from him as a direct consequence of his incarceration. Every day of continued supervision is another day that distance goes unresolved. The forward-looking purposes of supervised release have been fully satisfied in this case. Assessed against the factors enumerated in 18 U.S.C. § 3553(a) and U.S.S.G. § 5D1.4 (Nov. 2025), early termination is appropriate in this case. He respectfully asks this Court to recognize what his record has already demonstrated and terminate the remaining term of his supervised release.

## I. BACKGROUND

### a. Procedural History

In late 2019, Mr. Palma was contacted by a friend and was asked to do "a job." He flew to Miami, retrieved a package ultimately containing cocaine, and per instruction began driving back to New York. On November 27th, 2019, Mr. Palma was stopped by law enforcement while driving across the George Washington Bridge and a canine search of the vehicle revealed the package. Mr.

[1] In advance of this motion, the defense reached out to the government to obtain its position, but has not received a response.

Palma was charged with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). He pleaded guilty to that count.

On May 26, 2021, this Court sentenced Mr. Palma to 60 months of imprisonment followed by a three-year term of supervised release after qualifying for relief under the safety valve provision of 18 U.S.C. § 3553(f). Mr. Palma was transferred from MDC Brooklyn to the halfway house on February 1, 2024. He was released from the halfway house on October 21, 2024 and commenced his current three-year term of supervised release. He has now served twenty months of that term.

b. **Mr. Palma has maintained full compliance with the conditions of his supervised release.**

From the day he was released, Mr. Palma has been fully compliant with every condition of his supervised release. After six months on supervision, Mr. Palma was transferred to the SDNY's Low Intensity Unit ("LIU"), a designation reflecting the probation department's assessment that intensive supervision is no longer necessary or appropriate. His current supervising LIU officer interacts with Mr. Palma primarily via monthly written reports.

Mr. Palma sought and received permission to travel to the Dominican Republic for a week and a half to visit his wife and daughters, who remain there following his incarceration.. The trip was completed in full compliance with the travel conditions of his supervision, and his officer did not raise any concerns. Outside of that trip, Mr. Palma's movements have been entirely confined to the East Harlem neighborhood where he lives and works. Mr. Palma has not committed a violation of any condition of his supervised release and his compliance record is unblemished.

c. **Mr. Palma's personal background, employment, and family circumstances.**

David Palma is 47 years old. He was born in New York City but was sent as a young child to live with his grandparents in the Dominican Republic while his parents worked in New York City to support the family. He was reunited with his parents in the Dominican Republic at age eight and grew up there, attending school and earning a degree in Business Administration from college. He returned to New York permanently around 2015. He is a practicing Catholic and was raised in an active, community-oriented family.

Mr. Palma has been married to Alba Isaura Gutierrez Tavarez since 2006; they met while both were in college in the Dominican Republic. Together they have two daughters: Lisaura, who is 19 years old and currently studying law, and Valentina, who is 13 years old and in the seventh grade. Mr. Palma also has two sons from prior relationships — one of whom lives and works in East Harlem and another who lives and works in the Bronx — with whom he maintains close contact. His sister Priscilla lives in Miami, and the family remains deeply connected despite distance.

Mr. Palma has worked at Mis Hijos Deli at 123rd Street and 2nd Avenue in East Harlem since his time in the halfway house. He works seven days a week, typically arriving by six in the morning, and lives in the same building as the deli. The deli is a neighborhood institution in East Harlem: it serves local residents, employs community members, and has a longstanding reputation for generosity toward those in need. Mr. Palma has been described by his manager, Vladimir Tineo Martinez, as consistently "responsible, reliable and hardworking" — someone who "shows up on time, takes his duties seriously," and has become "a valued member of our team" whose "attitude and commitment have had a positive impact on our business." Letter of Vladimir Tineo Martinez, attached as Exhibit D.

Case 1:20-cr-00071-PKC Document 52 Filed 06/17/26 Page 3 of 7

Mr. Palma's wife, Alba, suffers from lupus, a chronic autoimmune condition that affects her daily health and energy levels and requires ongoing treatment. She must regularly travel to New York to receive medical treatments and must promptly return to the Dominican Republic to return to her daughters. She relies on Mr. Palma consistently for both emotional and physical support in managing their household. His presence, she writes, "brings stability and care not only to me, but to our entire family." Letter of Alba Palma, attached as Exhibit C. Even with their geographic distance, Mr. Palma supports Alba's health needs, guides their daughters' education, and serves as a steady source of accountability and love in the family's daily life. Their older daughter Lisaura is now pursuing a law degree. Mr. Palma wants to be present for that chapter of her life, and for their younger daughter's upbringing, in a way that geography and supervision conditions continue to complicate. *See* Letter of David Palma, attached as Exhibit B.

d. **Mr. Palma's conduct and programming during incarceration.**

Beyond a spotless disciplinary record, Mr. Palma approached his time at MDC Brooklyn with discipline and intention — working as many hours as he could and pursuing every educational and rehabilitative opportunity available to him. *See* Letters from MDC staff, attached as Exhibit F. These experiences laid the groundwork for a productive and quick reintegration during supervised release.

His institutional work record was distinguished. Assigned to the Commissary and Warehouse departments, his supervising officer wrote that he "reports to work without hesitation," is "a very quick learner" with "excellent memory," and "volunteers to assist other inmates once his job is complete" — describing him as "very dependable and one of our lead orderlies in the department." Ex. F. His formal BOP Work Performance Rating for October 2023, completed in the final months before his transfer, reflects scores of "Outstanding" — the highest available rating — across every evaluated category, including quality of work, initiative, need for supervision, and ability to work with others, and he received a performance bonus for that period. *Id.* A separate character reference from BOP staff member D. Ballard describes Mr. Palma as "polite, hard-working and always willing to help when needed" and "a more than suitable person" for reentry. *Id.*

His educational record is equally extensive. His BOP transcript reflects completion of over 35 courses — spanning financial literacy, health education, fitness, sociology, art, and more — including correspondence courses through the University of St. Francis and Columbia University. *See* Ex. F. He completed the Non-Residential Drug Abuse Program, Anger Management CBT, the Money Smart financial literacy series, and the GR Start Now cognitive-behavioral curriculum. *Id.* He was a Resolve Phase One therapeutic programming participant continuously from September 2021 through his transfer, was certified in Forklift Inspection and Safe Operation, and regularly attended church services throughout his incarceration. *Id.*

That record — zero violations, outstanding work performance ratings, over 35 completed courses, continuous therapeutic programming, and written commendations from BOP staff — is not merely background. It is the documented foundation of the rehabilitation that his twenty months of supervised release have continued to confirm.

## II. <u>LEGAL ARGUMENT</u>

a. **Section 3583(e)(1) Authorizes Early Termination.**

"Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Section 3583(e) gives the Court authority to terminate supervision at any time after the expiration of one year, if such action is "warranted by the conduct of

the defendant released and the interests of justice." 18 U.S.C. § 3583(e). When determining whether to grant such an application, the Court is instructed to consider the factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). *United States v. Harris*, 689 F. Supp. 2d 692, 694 (S.D.N.Y. 2010) (quoting 18 U.S.C. § 3583(e)).

Notably absent from that list is § 3553(a)(2)(A): the Court need not consider the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The Supreme Court made clear the importance of that omission in *Tapia v. United States*, holding that "a court may not take account of retribution… when imposing a term of supervised release." 564 U.S. 319, 326 (2011) (emphasis in original). The Court recently reemphasized this in *Esteras v. United States*, holding that district courts "cannot consider § 3553(a)(2)(A) when revoking supervised release," 606 U.S. 185, 195 (2025), or when "modif[ying] the terms of supervised release, such as by terminating supervised release early," *id.* at 192 n.3, because supervised release is "not a punishment," but is meant to "fulfill[] rehabilitative ends" and "provide[] individuals with postconfinement assistance." *Id.* at 196. Courts terminating supervised release "must consider the forward-looking ends of sentencing (deterrence, incapacitation, and rehabilitation) but may not consider the backward-looking purpose of retribution." *Id.*

The Second Circuit has explained that supervised release "was designed 'to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.'" *United States v. Aldeen*, 792 F.3d 247, 252 (2d Cir. 2015), as amended (July 22, 2015) (citation omitted). District courts in this Circuit have likewise recognized that supervised release is designed "to assist with rehabilitation, not to punish," and that Congress directs courts "to determine which defendants would benefit from the rehabilitative purposes of supervised release," with the corollary that those who no longer need those purposes qualify for early termination. *United States v. Trotter*, 321 F. Supp. 3d 337, 339, 345 (E.D.N.Y. 2018).

Section 3553(a)(5) additionally directs courts to consider "any pertinent policy statement issued by the Sentencing Commission." In its updated Guidelines Manual issued November 1, 2025, the Sentencing Commission promulgated U.S.S.G. § 5D1.4, which identifies six specific factors for courts to consider in determining whether to terminate a term of supervised release:

> (i) any history of court-reported violations over the term of supervision;
>
> (ii) the ability of the defendant to lawfully self-manage…;
>
> (iii) the defendant's substantial compliance with all conditions of supervision;
>
> (iv) the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;
>
> (v) a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision; and
>
> (vi) whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant.

U.S.S.G. § 5D1.4(b) (Nov. 2025). Section 5D1.4 does not require exceptional conduct to justify early

Case 1:20-cr-00071-PKC Document 52 Filed 06/17/26 Page 5 of 7

termination; a court must simply be satisfied that termination is warranted and in the interest of justice.

Mr. Palma has been on supervised release since October 2024 — more than the twelve-month minimum. He therefore satisfies the threshold requirement of § 3583(e)(1) and, as demonstrated below, every applicable factor under that statute and § 5D1.4 weighs in his favor.

b. **The Interests of Justice and Mr. Palma's Conduct on Supervision Warrant Early Termination.**

i. **The § 3553(a) Factors Weigh in Favor of Early Termination.**

The standard under § 3583(e)(1) is whether early termination is "warranted by the conduct of the defendant released and the interests of justice." Assessed against each of the six factors enumerated in U.S.S.G. § 5D1.4(b), the answer on Mr. Palma's record is clear and consistent. Every factor weighs in favor of termination.

Mr. Palma's supervised release record is spotless. Since October 21, 2024, he has submitted every monthly report, complied with all travel conditions, and maintained lawful, consistent employment throughout his supervision. That record began on his first day out and has not wavered. Mr. Palma's quick transfer to the Low Intensity Unit is the Probation Department's own institutional determination that he presents the lowest level of risk. That judgment is well-founded. He spends most of his time working and speaking with his family, constantly motivated to reunite with them and provide the best life for his daughters.

That record does not stand alone. It is the continuation of a pattern running through every phase of this case: full compliance during pretrial supervision, zero disciplinary incidents across more than two and a half years at MDC Brooklyn, Outstanding ratings across every category on his final BOP Work Performance Review, a formal BOP classification of Minimum Risk Recidivism Level, and written commendations from BOP staff describing him as "an exemplary member of the Cadre unit" who "has always had a positive attitude and has always been dependable." Ex. F. The compliance Mr. Palma has demonstrated on supervised release is not a recent development. It is a sustained and documented pattern.

Mr. Palma's prosocial engagement is deep and genuine. He works seven days a week at Mis Hijos Deli in East Harlem, arriving by six in the morning and living in the same building — a commitment his manager describes as "responsible, reliable and hardworking," with an "attitude and commitment" that "have had a positive impact on our business." Ex. D. Beyond his employment, between July and December 2025 he provided food and housing to the 22-year-old son of longtime friend William Vallejos while the young man awaited Army enlistment — mentoring him, modeling discipline, and sharing his own experience candidly to help guide the young man's choices. *See* letter of William Vallejos, attached as Exhibit E. That son is now completing basic training at Fort Benning. Mr. Vallejos, who has known Mr. Palma for thirty years and submitted a letter at his sentencing, writes that he is "forever grateful." *Id.* These are not activities undertaken to satisfy supervision conditions. Mr. Palma's commitment to work, family, and community is structural — and his singular mission to reunite with his family and build the strongest possible life for them is reflected in all that he does. The prosocial foundation supervision is meant to help build is firmly and independently in place.

Mr. Palma has no prior criminal history; this was his first arrest and conviction. His role in the offense was that of a courier — not an organizer, a leader, or a repeat participant in any drug network — and his offense was entirely non-violent. He does not use drugs and has never been ordered into treatment. The circumstances that contributed to the offense — a period of drift from his family and susceptibility to outside influence — are no longer present. In their place is a focused, work-driven, family-centered life with no room for the conduct that brought him to this Court. There is no

Case 1:20-cr-00071-PKC Document 52 Filed 06/17/26 Page 6 of 7

identifiable risk factor that points toward continued supervision serving any protective or deterrent purpose.

ii. **Continued Supervision Impedes the Goals It Is Designed to Serve.**

Supervised release exists to promote reintegration — through stable employment, family ties, and community connection. Here, the conditions of supervision have begun to work against each of those objectives.

Mr. Palma's wife, Alba, suffers from Systemic Lupus Erythematosus, confirmed since 2019 by her treating rheumatologist at Hospital Metropolitano de Santiago. Her physician has certified that the disease is in moderate activity and that productive work is not recommended due to the disease. Alba relies on Mr. Palma for emotional, financial, and physical support in managing their household and her health. His presence, she writes, "brings stability and care not only to me, but to our entire family." Ex. C. The travel restrictions and reporting obligations of supervised release are now directly interfering with Mr. Palma's ability to fully support his family. Both of his daughters remain in the Dominican Republic, as their family could not afford to maintain the children in New York without the support of Mr. Palma. Every month he remains under supervision is another month that Mr. Palma cannot fully support his sickly wife and daughters.

Courts in this district have repeatedly recognized the dignitary dimension of termination — the "significance to defendants of 'being off the papers' and becoming one's own person without reporting requirements and without having to request permission to engage in travel or other activities." *United States v. Roman et al.*, No. 06 Cr. 268-26 (JBA), Order (D. Conn. Jan. 4, 2023) at 2. And as Judge Dearie has recognized, early termination serves a broader expressive purpose as well: it "remind[s] others that such laudable progress is possible and will reap rewards." *United States v. Jiminez*, 2021 WL 535208 (E.D.N.Y. Feb. 12, 2021).

Courts in this district have regularly employed early termination to recognize rehabilitation that supervision no longer needs to support. *See, e.g., See, e.g.*, *United States v. Soto*, 19 Cr. 903 (KMW) (S.D.N.Y. 2026) (granting early termination of supervised release); *United States v. Trotman*, 23 Cr. 63 (LGS) (S.D.N.Y. 2026) (same); *United States v. McIntosh*, 24 Cr. 480 (GHW) (S.D.N.Y. 2026) (same); *United States v. Cruz*, 19 Cr. 770 (JMF) (S.D.N.Y. 2025) (same); *United States v. Goenaga*, 18 Cr. 840 (VEC) (S.D.N.Y. 2025) (same); *United States v. Sabaly*, 20 Cr. 473 (VM) (S.D.N.Y. 2025) (same); *United States v. Baez*, 22 Cr. 364 (KPF) (S.D.N.Y. 2025) (same); *United States v. Jahquan Crump*, 19 Cr. 785 (KMK) (S.D.N.Y. 2025) (same); *United States v. McKelvey*, 17 Cr. 511 (SHS) (S.D.N.Y. 2025) (same); *United States v. Mangual*, 23 Cr. 429 (JGK) (S.D.N.Y. 2024) (same); *United States v. Lallave*, 19 Cr. 15 (AJN) (S.D.N.Y. 2024) (same); *United States v. Sprecher*, 19 Cr. 749 (JPO) (S.D.N.Y. 2024) (same); *United States v. Haney*, 19 Cr. 541 (JSR) (S.D.N.Y. 2024) (same); *United States v. Grullon*, 23 Cr. 106 (PGG) (S.D.N.Y. 2023) (same); *United States v. Zavala*, 18 Cr. 735 (KPF) (S.D.N.Y. 2023) (same); *United States v. Enriquez*, 20 Cr. 455 (RA) (S.D.N.Y. 2023) (same); *see also United States v. Young*, 20 Cr. 201 (KMW) (S.D.N.Y. 2024) (terminating probation early).

The Sentencing Commission, in promulgating § 5D1.4, has directed that supervision resources be concentrated on those who genuinely need them. *See Trotter*, 321 F. Supp. 3d at 340. Mr. Palma does not. He has been formally assessed at minimum recidivism risk by the BOP. He has an unblemished twenty-month compliance record while on supervised release. He is stably employed, actively mentoring others, and supporting a spouse with a serious chronic illness — without any ongoing need for court-imposed structure to sustain that conduct. Maintaining supervision over him diverts resources from defendants who actually require oversight, without providing any corresponding benefit to Mr. Palma, to the Court, or to the public. As courts in this Circuit have

Case 1:20-cr-00071-PKC Document 52 Filed 06/17/26 Page 7 of 7

recognized in similar cases, "there is simply no need to further burden the Probation Department and waste valuable resources by continuing [a defendant] on supervised release" where the rehabilitative purposes of supervision have been fully achieved. *United States v. Anthony Morgan*, 820 F. Supp. 3d 203, 212 (E.D.N.Y. 2026). Termination here serves not only Mr. Palma — it serves the rational and equitable allocation of this district's limited supervisory capacity.

## III. CONCLUSION

For the foregoing reasons, Mr. Palma respectfully requests that the Court grant this motion and terminate his supervised release in this case, pursuant to 18 U.S.C. § 3583(e)(1). Thank you for your consideration.

Respectfully submitted,

Marisa K. Cabrera

Marisa K. Cabrera, Esq.
James Bourtis, Legal Intern
Counsel to Mr. Palma
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007

CC: AUSA Emily Johnson